UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 1:08CR 164 RWS |
| | ) | |
| JIMMIE LEE MILLS, | ) | |
| | ) | |
| Defendant(s). | ) | |

## REPORT AND RECOMMENDATION

Defendant Jimmie Lee Mills has filed Defendant's Motion to Suppress Evidence and Statements (Document #31). In his motion, the defendant asks that the court suppress as evidence any physical evidence seized from the person or possession of the defendant on December 3, 2008, and any oral or written statement or other writings made by defendant, including any conversations in which the defendant participated as overheard by agents of the government; any interviews by defendant by and with any federal, state or local law enforcement agents; and other statements made before any state or federal grand jury.

The defendant alleges in his motion that officers who searched his home on December 3, 2008, did not have probable cause to request the search warrant and the issuing judge did not have sufficient probable cause to issue the warrant based on the information given in the Affidavit by Special Agent David Diveley of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

The defendant claims that any statements he made were involuntary because they were elicited by coercion and were elicited without the defendant's being fully advised of and afforded

his rights under the Fifth Amendment.

Finally, the defendant argues that any statements made by him were the result of an unlawful arrest and, therefore, are inadmissible.

## Factual Background

On December 3, 2008, a search was conducted at the residence of defendant Jimmie Lee Mills located at Route 2, Box 2708, Piedmont, Missouri, pursuant to a search warrant issued on December 1, 2008, by the Honorable Lewis M. Blanton, United States Magistrate Judge for the Eastern District of Missouri, Southeastern Division. The search warrant was for a .44 caliber handgun, a .270 caliber rifle, and an AR-15, semi-automatic rifle, all of unknown manufacturer; a Ruger, Mini-14, .223 caliber, semi-automatic rifle, and all other firearms and ammunition possessed in violation of Title 18, United States Code, Section 922(g)(1); records reflecting the acquisition and disposition of firearms; and records reflecting the residency of defendant Mills at Route 2, Box 2708, in Piedmont, Missouri.

On December 3, 2008, ATF Agent David J. Diveley, assisted by other federal, state and local law enforcement officers, executed the search warrant at defendant Jimmie Lee Mills' residence. Agent Diveley and Missouri Department of Conservation Agent Brian Towe were the first to arrive at Mills' residence. Mr. Mills was in his back yard. Diveley identified himself to Mr. Mills and advised Mills that Agent Diveley possessed a federal search warrant for defendant Mills' residence. Diveley read the search warrant to Mr. Mills. The other agents and officers were then contacted by radio and they came to the Mills residence. Defendant Mills walked Agent Diveley through the back door of the Mills residence and opened the front door of the residence, so that entry could be made by the other officers. A security sweep was conducted of

Mills' residence, and no one else was found at the residence.

During the execution of the search warrant at Mills' residence, law enforcement officers discovered and seized the items listed in Exhibit 1 attached to this Report and Recommendation attached.

During the execution of the search warrant, Agent Diveley interviewed defendant Mills at the kitchen table of his residence. Also present during the interview was Missouri State Highway Patrol Sergeant Mike Carson. Prior to interviewing Mills, Diveley verbally advised Mills of his rights pursuant to the Miranda decision from a preprinted card. Defendant Mills stated to Agent Diveley that he understood his rights and agreed to answer Agent Diveley's questions. During the interview Mr. Mills told Agent Diveley that he had lived at this address since 1988. Mills stated that all the firearms in his residence belonged to his wife, Joyce McQuay. Mills stated that all the firearms owned by his wife originally belonged to her deceased husband, Sam McQuay. Mr. Mills stated that the only gun that had been purchased since the death of Sam McQuay had been a .25 caliber semi-automatic pistol. Mills stated that Joyce McQuay, who was not present when the search warrant was executed, currently had the .25 caliber pistol with her in Piedmont.

Mr. Mills also stated to Agent Diveley that there was a .243 caliber rifle located in his 1992 Ford F-150 pickup truck that was parked in the back yard. Mills stated that he used the .243 caliber rifle to deer hunt during the 2008 firearms deer season. Mills stated that his DNA would be on all the guns present in the residence. Mills stated that he had shot all of the guns in the house at one time or another. Mills stated that he target shoots with his nephews in the back yard. Mills stated that it had been two or three months since he had last shot a gun. Mills stated that both he and his wife shoot all of the guns on occasion.

Mr. Mills stated that he had not had a .270 caliber rifle in his residence for a couple of years. Mills also stated that his bedroom was located on the first floor in the northwest corner of the house.

When a short-barreled shotgun was found under the bed in the bedroom on the first floor in the northwest corner of the house, Mr. Mills originally denied ownership of the gun. Mills subsequently said that the short-barreled shotgun did not belong to his wife. Then Mills said, "I'll take it." Mills then stated, "I think I need to talk to Dwayne." Knowing that Mills was referring to attorney Dwayne Hackworth, Diveley ceased questioning Mills at that time.

Diveley allowed Mills to call Dwayne Hackworth's office. When Mills hung up the phone, Mills stated that he did not want to answer any more questions. He was not asked any more questions.

Mills was kept at the kitchen table while the search was being conducted and Agent Diveley sat with Mills for security. Diveley and Mills had a general conversation about farming and cattle and wood cutting, but did not discuss any criminal activity. While Diveley and Mills were seated there, Missouri State Highway Patrol Sergeant Don Windham approached Agent Diveley carrying a Western Field shotgun. Sergeant Windham asked Diveley how to release the slide on the shotgun. Mills pointed to the release and stated, "Pull that back." Mr. Mills then stated, "We had a dog problem. One of the dogs killed one of my calves and I had to shoot it."

Defendant Mills was transported first to the City of Piedmont Jail and then to the Cape Girardeau County Jail.

## Discussion

## Probable Cause

The United States Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332 (1983).

The standard to be used by a judge reviewing the decision to issue a search warrant is different from the standard to be used by the judge who issues the search warrant. As the Supreme Court stated in Gates more fully, Id.:

> The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed. Jones v. United States, 362 U.S., at 271, 80 S.Ct., at 736.

The Supreme Court rejected the prior tests required by Spinelli v. United States, 393 U.S. 410, 898 S.Ct. 584 (1969), finding that "the complex superstructure of evidentiary and analytical rules that some have seen implicit" in the Spinelli decision cannot be reconciled with the fact that many warrants quite properly are "issued on the basis of non-technical, common sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." Id. at 235, 2331. The Court offered the following caution to reviewing courts, Id. at 236, 2331:

> Similarly, we have repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's "determination of probable cause should be paid great deference by reviewing courts." Spinelli, supra, 393 U.S., at 419, 89 S.Ct., at 590. "A grudging or negative attitude by reviewing courts toward warrants," Ventresca, 380 U.S., at 108, 85 S.Ct., at 745, is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; "courts should not

invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a common sense, manner." Id., at 109, 85 S.Ct., at 746.

Probable cause is

a fluid concept--turning on the assessment of probabilities in particular factual contexts--not readily, or even usefully, reduced to a neat set of legal rules. Informants' tips doubtless come in many shapes and sizes from many different types of persons. As we said in Adams v. Williams, 407 U.S. 143, 147, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972): "Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability." Rigid legal rules are ill-suited to an area of such diversity.

Gates, 462 U.S. at 232, 103 S.Ct. at 2329.

The Supreme Court found, 462 U.S. at 231, 103 S.Ct. at 2328, quoting from Brinegar v. United States (citation omitted), that the probable cause standard is a "practical, nontechnical conception" and "In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

As the Supreme Court stated in Gates, our review of the sufficiency of the affidavits should not take the form of a de novo review.

The affidavit of Agent Diveley provided the following information. It stated first that Agent Diveley was conducting an investigation regarding the illegal possession of firearms by the defendant, Jimmie Lee Mills, giving his address as stated both in the application and affidavit as well as the search warrant.

The affidavit recites the felony convictions of Mr. Mills: Assault With Intent to Rape With Malice Aforethought; Stealing; Stealing; and Escape From Confinement. For each of these convictions, the defendant was sentenced to more than a year in the Missouri Department of

Corrections.

The affidavit continues that Agent Diveley had been advised by Missouri Conservation Agent Brian Towe that an examination of the records maintained by the Missouri Department of Conservation indicates that Mills purchased firearms deer and turkey tags for the year 2008. Further examination indicated that Mills had purchased firearms deer and turkey tags in 2004, 2005, 2006 and 2007.

Agent Diveley interviewed two concerned citizens regarding the defendant. The citizens stated that they are neighbors of Mr. Mills and did not want their names used in the affidavit for fear of retaliation by Mills. A female concerned citizen stated that during the firearms deer season in November of 2008, she heard Defendant Mills at a local grocery store bragging that he (Mills) had killed a deer this year using his .270 caliber rifle. The same female concerned citizen stated that in the summer of 2008, the neighborhood in which they live was experiencing some problems with some people. She stated that Mills approached her and stated, "If you have any problems, come and get me because I'm always packing a pistol." A male concerned citizen stated that he had heard Mr. Mills brag about owning a .44 caliber handgun which Mills claims to carry in his pickup truck at all times. The male concerned citizen stated he also had heard Mills brag about shooting his (Mills's) rifle which Mills described as an AR-15 or a Mini-14 rifle.

The affidavit continues that the male concerned citizen stated that Mills told him about these rifles approximately two months before the execution of the affidavit, which occurred on December 1, 2008. This male concerned citizen, a neighbor of Defendant Mills, stated that Mr. Mills hunts on Mr. Mills's property and has hunted on that property for many years. The male

concerned citizen also stated that another neighbor claimed to have seen Mr. Mills in possession of a .44 caliber handgun in the recent past.

Missouri Board of Probation and Parole Officer Pamela Morris stated to Agent Diveley that she lives near Mills and reported that her deceased husband stated that he had seen Mills with firearms on several occasions.

The court finds the information in Agent Diveley's affidavit was reliable.

Information based upon observations of a law enforcement officer or on his or her first-hand information should be accepted as reliable. United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747 (1965). This description would apply to the statements by Missouri Probation Officer Morris. Her husband was an eye witness as were both of the concerned citizens, both male and female, who heard Mr. Mills make statements about being in possession of weapons and observing Mr. Mills hunting on his own property "An informant who alleges he is an 'eye witness' to an actual crime perpetrated demonstrates sufficient 'reliability' of the person." McCreary v. Sigler, 406 F.2d 1964, 1969 (8th Cir. 1969); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329 (1959). The statements of the concerned citizens come from ordinary citizens, who had no motive to lie and who were first-hand observers of the information given and, consequently, were entitled to be considered trustworthy. Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983).

The information contained in the affidavit was reliable and, in conjunction with knowledge of Jimmie Mills's felony convictions, provided "a fair probability that contraband or evidence of crime [would] be found in a particular place." Gates, 462 U.S. at 238, 103 S.Ct. at 2332. Consequently, this court finds that the search warrant in question was issued based on

probable cause.

The court realizes that it is the one who issued the search warrant, but at the same time, any conclusions contained in this report and recommendation are subject to de novo review by the trial judge to whom it is addressed.

In addition, Agent Diveley testified at the evidentiary hearing that he believed he had probable cause to search Mr. Mills's home. He testified he believed the search warrant was a valid search warrant. The evidence seized at the defendant's residence on December 3, 2008, was seized by officers relying in objective good faith upon a facially valid warrant. United States v. Leon, 468 U.S. 897 (1984).

Because the affidavit of Agent Diveley provided probable cause for the issuance of the search warrant, the defendant's claims that the officers did not have probable cause to request the search warrant and that the issuing judge did not have sufficient probable cause to issue the warrant are without merit.

The court finds that the items seized from the defendant's residence were seized pursuant to a valid search warrant, should not be suppressed and are admissible in evidence.

## Defendant's Statements

Before the defendant was interviewed at his kitchen table by Agent Diveley, he was advised by Diveley of his rights pursuant to the Miranda decision from a pre-printed card. An enlarged exact duplicate of the advice of rights card was introduced into evidence. The defendant, during his interview, made a number of comments about the weapons found in his home.

As the officers came into the home after the defendant opened the front door, there was a

gun rack on the wall in view of the officers as they walked past. Agent Diveley testified that the defendant was placed in handcuffs and was considered to be in custody when they sat down at the kitchen table.

During the search, a short-barreled shotgun was found under the bed in the bedroom in the northwest corner of the house. At first, the defendant denied ownership of the gun. He later said that the short-barreled shotgun did not belong to his wife and then Mr. Mills said, "I'll take it." At that point, he stated, "I think I need to talk to Dwayne." Agent Diveley understood that Mr. Mills was referring to Attorney Dwayne Hackworth and Agent Diveley stopped the questioning of Mr. Mills. Mr. Mills did call Dwayne Hackworth's office and when he hung up the phone, Mr. Mills stated he did not want to answer any more questions. No further questions were asked of Mr. Mills.

At one point, Highway Patrol Sergeant Don Windham approached Agent Diveley carrying a Western Field shotgun. Sergeant Windham asked Agent Diveley how to release the slide on the shotgun. Mr. Mills pointed to the release and stated, "Pull that back." Mr. Mills then said, "We had a dog problem. One of the dogs killed one of my calves and I had to shoot it." This remark was not made in answer to any question asked of Mr. Mills.

Before the short-barreled shotgun was found and Dwayne Hackworth was called, Mr. Mills told Agent Diveley that there was a .243 caliber rifle located in his '92 Ford F-150 pickup truck that was parked in the back yard. That rifle was also seized.

When Agent Diveley first approached Mr. Mills before the search, when Mr. Mills was in the back yard, Agent Diveley told Mr. Mills that he had a federal search warrant for the defendant's residence. Mr. Mills looked at the affidavit and at the conclusion of the reading of

the search warrant, Agent Diveley advised Mr. Mills that he was being arrested. Agent Diveley then advised Mr. Mills of his Miranda warnings.

During the interview of Mr. Mills, the defendant was cooperative. Mr. Mills did not tell Agent Diveley that he (Mills) was hard of hearing. He did not ask Diveley to repeat any questions. His answers were responsive to the questions asked.

At the time of his arrest and interview, Mr. Mills was 66 years old. He is a high school graduate. There is no indication that Mr. Mills suffers from any mental impairments. He did suffer two heart attacks for which he does draw social security disability. The defendant was given the Miranda warnings which he told Agent Diveley he understood and then agreed to answer Diveley's questions. The testimony was that Mr. Mills was cooperative during the interview and his comments, as related in the Factual Background of this report, indicate an ease in speaking with Agent Diveley. The defendant has been convicted of four felony offenses and is familiar with the criminal justice system.

There is no indication of any type of coercion exercised against Mr. Mills. He was allowed to call his attorney after the defendant became concerned when the sawed-off shotgun was found. As soon as Mr. Mills indicated he wanted to speak to his attorney, all questioning ceased. The defendant's statement after he spoke to Attorney Hackworth's office, that he did not want to answer any more questions, was respected.

The defendant's explanation of how to release the slide on a shotgun found by Sergeant Windham was not made in response to a question addressed to him but was a volunteered statement, as was his admission that he had to shoot a dog which had killed one of his calves.

The court finds that statements made to Agent Diveley and other officers on December 3,

2008, were made after he was advised of his Fifth Amendment rights pursuant to Miranda v. Arizona, were not the result of any type of coercion, followed a knowing waiver of his Fifth Amendment rights, were voluntary and are admissible into evidence.

There was ample probable cause to arrest the defendant for being a previously convicted felon in possession of firearms. The statements of the defendant on December 3, 2008, were not the result of an unlawful arrest and are admissible in evidence.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements (Document #31) be denied.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 17th day of March, 2009.